# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2011

No. 10-60604

Lyle W. Cayce
Clerk

AMERISTAR AIRWAYS, INCORPORATED; AMERISTAR JET CHARTER, INCORPORATED,

Petitioners

v.

ADMINISTRATIVE REVIEW BOARD, UNITED STATES DEPT OF LABOR,

Respondent

Petition for Review of the Final Decision and Order of the
United States Department of Labor Administrative Review Board

Before HIGGINBOTHAM, OWEN, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Thomas E. Clemmons, the former director of operations for Ameristar Airways, filed a complaint with the Secretary of Labor alleging he was discharged in retaliation for reporting air safety issues to the Federal Aviation Administration. The Department of Labor Administrative Review Board found a violation of the employee protection provision of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"),[1] ordering an award

---

[1] 49 U.S.C. § 42121; *see also* 29 C.F.R. Part 1979.

No. 10-60604

of back pay.[2]   We affirm the finding of liability but remand to the agency for additional findings regarding the amount of back pay.

I

A

Clemmons was hired by Ameristar Airways in September 2002.   As director of operations, Clemmons was responsible for hiring and scheduling pilots, maintaining pilot training records, and updating manuals and required navigational information (known in industry parlance as "charts").

Soon after he was hired, Clemmons fielded several pilot complaints about pay and duty-time violations.  Under FAA regulations, each flight crew member must be relieved from duty for at least 8 consecutive hours during any 24-hour period.[3]   On December 17, Clemmons sent an email to Ameristar president Thomas Wachendorfer, manager Lindon Frazer, and head of dispatch Stacy Muth, notifying them that pilots were being pushed to work beyond the duty-time limits and that this was a violation of FAA regulations.

Clemmons also raised concerns about Ameristar's maintenance log policy, which required pilots to confer with officials at company headquarters before recording any maintenance issues in their logbooks.  Clemmons complained to company management that he believed this a violation of federal regulations.

On December 31, Clemmons complained to Muth that Ameristar Airways was sharing another airline's call sign without FAA approval, another violation of federal regulations.  Clemmons offered to begin the process of requesting a

---

[2] *Clemmons v. Ameristar Airways, Inc.*, No. 08-067, 2010 WL 2158230 (Dep't of Labor Admin. Rev. Bd. May 26, 2010).

[3] *See* 14 C.F.R. § 125.37.

No. 10-60604

new call sign for Ameristar flights, but he was instructed by Frazer not to do so. Ameristar was later fined $123,000 for this violation.

On January 7, Clemmons and his chief pilot, Brent Barker, held a meeting with FAA official Ron Brown. The meeting took place in Clemmons's office at Ameristar headquarters and was made known to Ameristar management. Clemmons and Barker discussed with Brown their concerns about duty-time violations and improper call sign use. Later that month, Frazer recommended to Wachendorfer that Clemmons be terminated; Wachendorfer concurred. Clemmons was officially terminated on January 20, 2003.

B

The record also reflects allegations by Ameristar that Clemmons had significant performance and disciplinary issues during his brief period of employment.

Clemmons was charged with keeping charts, pilot records, and manuals up to date. An internal audit of Ameristar's pilot records in November 2002 determined that certain training records were deficient. A follow-up audit in January 2003 found some records still incomplete. Ameristar also received a pilot complaint in mid-December stating that the pilot was "unsure" if his charts were current, although it was later determined that they were. Ameristar further complains that Clemmons did not complete any updates to its operational manuals before he was terminated.

On January 16, shortly before his termination, Clemmons assisted a pilot with a revenue flight that was scheduled to transport 24 pallets of freight. Clemmons and the pilot were only able to load half the pallets onto the flight because the customer had provided incorrect pallet dimensions. After Wachendorfer intervened and instructed the pilot on how to load the pallets,

3

No. 10-60604

they were able to successfully load 20 of the 24 pallets onto the plane, eight more than Clemmons and the pilot had previously been able to fit.

Clemmons and Wachendorfer also had disputes over pilot scheduling. Following management's instruction to arrange a "two weeks on and one week off" schedule, Clemmons attempted to prepare pilot schedules with 14 days on and 7 days off. Each of Clemmons's schedules was reviewed and approved by Frazer before the schedules were sent out to the pilots. On January 9, Wachendorfer sent a memo to Clemmons, copying Frazer, stating that the approved schedules were unsatisfactory. After consulting with Muth, Clemmons submitted a revised schedule, which Wachendorfer again rejected. Wachendorfer eventually had Frazer create a substitute schedule with 15 days on and 6 days off.

On January 13, Clemmons sent an email to the pilots explaining that, although he prepared a schedule with 14 days on and 7 days off, he was overruled by Wachendorfer. The email voiced several other complaints about Ameristar management and referred mockingly to Wachendorfer as "Mr. Wackmeoffendorfer." Clemmons told the pilots that he was hoping to leave the company soon, and he offered to support any pilots who wished to quit the company by assisting them with their resignation letters and supporting their unemployment claims. Although Clemmons now acknowledges that this email was insubordinate, unprofessional, and grounds for termination, the record indicates that Ameristar was not aware of the email or its contents until March 28, two months after Clemmons's January 20 termination.

C

Following his termination Clemmons filed a claim for unemployment benefits from the Texas Workforce Commission; Ameristar contested the claim. In filings submitted to the commission on February 5 and March 31, Ameristar

4

No. 10-60604

stated that Clemmons was fired for failing to produce the most economical pilot work schedules. In a third filing on April 4, Ameristar again cited problems with pilot scheduling as well as the January 16 freight-loading incident.

Based on the filings, the Commission ordered an award of unemployment benefits. Ameristar appealed. At a hearing on June 30, Ameristar for the first time raised the insubordinate email as a reason for termination. The Commission eventually reversed its earlier award after determining that Clemmons's insubordination rendered him ineligible for unemployment benefits.

## D

Clemmons filed a timely complaint with the Secretary of Labor, alleging he was discharged in violation of AIR21's employee protection provision. An administrative law judge received live testimony and evidence at a four-day hearing in July 2004 and a two-day hearing in September 2004. Based on the hearings, exhibits, and post-hearing briefs submitted by the parties, the ALJ found Ameristar liable for retaliation and ordered an award of back pay, interest, costs, and attorneys' fees. Ameristar appealed to the Administrative Review Board, which vacated and remanded because of legal error. On remand under the proper legal standard, the ALJ again found Ameristar liable and reinstated the award. Adopting the ALJ's factual findings, the Board affirmed.

## II

We may not set aside Board's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law."[4] We review an administrative agency's conclusions of law *de novo* and its findings of fact for

---

[4] *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 490 (5th Cir. 2005) (citing 5 U.S.C. § 706(2)).

substantial evidence.[5] We examine the entire record, considering the evidence on both sides,[6] and must affirm the Board's decision unless it would not be possible for a reasonable trier of fact to agree with its conclusions.[7] We are especially reluctant to disturb an agency determination where, as here, the Board upholds the findings of an administrative law judge who conducted live hearings.[8]

The Administrative Review Board evaluates AIR21 claims under the *McDonnell Douglas* burden-shifting framework.[9] The complainant bears the initial burden of presenting a *prima facie* case,[10] which for an AIR21 retaliation claim requires (1) that the complainant engaged in protected activity; (2) that the employer had knowledge of this activity; (3) that the complainant suffered an "unfavorable personnel action"; and (4) that the circumstances "raise the inference that the protected activity was a contributing factor in the unfavorable action."[11] The burden then shifts to the employer to proffer a legitimate, non-retaliatory reason for its action.[12] The employer's burden is only one of production, not persuasion; the complainant at all times retains the ultimate burden of persuading the trier of fact that his protected activity was a

---

[5] *Id.*; *McCoy v. R.R. Retirement Bd.*, 935 F.2d 87, 88 (5th Cir. 1991).

[6] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951).

[7] *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67 (1998).

[8] *See, e.g.*, *NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1342–43 (5th Cir. 1993).

[9] *See Peck v. Safe Air Int'l, Inc.*, No. 02-028, 2004 WL 230770, at *7 (Dep't of Labor Admin. Rev. Bd. Jan. 30, 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973)).

[10] *McDonnell Douglas*, 411 U.S. at 802.

[11] 29 C.F.R. § 1979.105(b)(1); *see* 49 U.S.C. § 42121(b)(2)(B)(i).

[12] *Tex. Dep't of Cmnty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981).

No. 10-60604

contributing factor in the personnel action.[13]   Once the employer supplies a permissible justification, the burden then shifts back to the complainant to show that the employer's explanation is pretextual—that the proffered explanation was not the true reason for its decision.[14]

Once the complainant adduces evidence of pretext, the burden-shifting framework drops out and the trier of fact is left to decide, by a preponderance of the evidence, the "ultimate question" of whether the complainant's protected activity was a contributing factor in the employer's decision.[15] A *prima facie* case of retaliation combined with evidence of pretext may be sufficient for the trier of fact to find liability; no additional evidence is required.[16]

Even where the complainant succeeds at proving a violation, AIR21 offers an affirmative defense that may allow the employer to avoid liability.  Under this provision, no relief may be granted "if the employer demonstrates by clear and convincing evidence that the employer would have undertaken the same unfavorable personnel action in the absence of" the complainant's protected activity.[17]

III

A

We have little trouble concluding that Clemmons presented a *prima facie* case of retaliation.  It is undisputed that Ameristar was aware of Clemmons's

---

[13] *Id.*; *see also id.* at 253.

[14] *McDonnell Douglas*, 411 U.S. at 804–05.

[15] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see* 49 U.S.C. § 42121(a), (b)(2)(B)(iii).

[16] *Reeves v. Sanderson Plumbing Prods., Inc.* 520 U.S. 133, 147–48 (2000).

[17] 49 U.S.C. § 42121(b)(2)(B)(iv); *see also* 29 C.F.R. § 1979.109(a).

No. 10-60604

protected activities and that Clemmons was subsequently discharged. This leaves only the question of whether the protected activity was "a contributing factor" to the discharge.

We have held that a contributing factor "is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision."[18] Under Department of Labor regulations, "Normally the burden is satisfied . . . if the complaint shows that the adverse employment action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse actions."[19] Clemmons complained of federal safety violations to Ameristar management on December 17; he complained to a Federal Aviation Administration official on January 7; and he was fired on January 20. This satisfies Clemmons's burden for establishing a *prima facie* case.

## B

Ameristar proffered six distinct non-retaliatory reasons for Clemmons's discharge. We agree with the ALJ and the Board that Clemmons adduced sufficient evidence for a trier of fact to find each of these reasons pretextual:

1. *Pilot confusion over charts.* Although Ameristar did receive a complaint from a pilot who was "unsure" if he had the right charts, it was ultimately determined that the charts were correct and up to date. There is no evidence that Clemmons made any mistake or failed to follow adequate procedures in managing the navigational charts.

2. *Failure to update operational manuals.* Ameristar complains that Clemmons never completed any update to its manuals

---

[18] *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008) (internal quotation marks omitted).

[19] 29 C.F.R. § 1979.104(b)(2).

during his short time with the company. It admits, however, that it never reviewed the manuals until after Clemmons's discharge, so this could not have been the actual reason for his termination. Further, there has been no showing that the manuals were deficient or that any of Clemmons's predecessors were terminated for failing to keep up-to-date manuals before he was hired.

3.    *Failure to maintain pilot training records.* The November 2002 internal audit, occurring two months after Clemmons was hired, alleged certain deficiencies in Ameristar's pilot training records. The airline's training records were then approved by the FAA in December 2002, indicating that any deficiencies were minor. A second internal audit in January 2003 found that some records had been corrected, but not all. Given the limited significance of the errors, the progress in correcting them, and the short time frame involved, there is little indication that the alleged errors could have supported Clemmons's termination.

4.    *Pilot scheduling disputes.* All of Clemmons's pilot schedules were approved by Frazer. Wachendorfer concedes that he never criticized Frazer for the schedules, only Clemmons. Wachendorfer claimed at a live hearing that Clemmons's schedules provided insufficient crew coverage, but he was not able to produce any schedules supporting that charge. Wachendorfer was not otherwise able to clearly articulate what, if anything, was inadequate about Clemmons's schedules.

5.    *The insubordinate email.* We agree that the contents of Clemmons's email to the pilots could provide unassailable grounds for termination. The record indicates, however, that Ameristar management was not aware of this email until March 28, more than two months after Clemmons was terminated, and therefore it could not have been the actual basis for his termination. Additionally, Ameristar did not identify the email as a ground for termination in either its February 5 or March 31 responses to Clemmons's claim for unemployment benefits.

No. 10-60604

6.   *The freight-loading incident.* The evidence indicates that this incident was caused by the customer providing incorrect pallet measurements, not because of any evident error by Clemmons. Wachendorfer admitted at the live hearing that no other employee, including the other pilot involved in this incident, has been fired for an incident like this.

The Board further concluded that an inference of pretext could be drawn from Ameristar's shifting explanations. In its filings with the Texas Workforce Commission shortly after Clemmons's termination, the board cited only two reasons for its decision: problems with Clemmons's pilot schedules and the single freight-loading incident. At the live hearing in July 2004, Wachendorfer mentioned only these same two reasons, saying he could not think of any other reason for the termination. Not until long after Clemmons's discharge did Ameristar allege the other four reasons, tending to suggest those reasons "are a mere litigation figment."[20]

C

Having come to the end of the *McDonnell Douglas* analysis, it falls to the trier of fact to decide whether Clemmons has shown, by a preponderance of the evidence, that his protected activity was a contributing factor in his discharge. Substantial evidence supports the Board's conclusion that Clemmons satisfied his ultimate burden.

The agency devoted significant weight to the temporal proximity of Clemmons's discharge to his protected activity. Clemmons met with an FAA official to complain of safety violations on January 7. He was terminated less

---

[20] *Marathon LeTourneau Co. v. NLRB*, 699 F.2d 248, 252 (5th Cir. 1983); *see also Vieques Air Link, Inc. v. U.S. Dep't of Labor*, 437 F.3d 102 (1st Cir. 2006) ("[T]he fact that an employer offers shifting explanations for its challenged personnel action can itself serve to demonstrate pretext.").

than two weeks later. It is not unreasonable for a trier of fact to think this timeline gives rise to a natural inference of cause and effect.[21]

Ameristar insists that the timeline actually undermines Clemmons's claim because several of its asserted reasons for termination arose in the time between the protected activity and the discharge, defeating the inference of causation. Yet we think the trier of fact could permissibly conclude precisely the opposite—that the suspicious timing of these performance critiques reveals them to be mere pretext. Within days of the FAA meeting, Wachendorfer rejected as unacceptable pilot schedules that were already approved and conformed to prior management directives; ordered a new audit of all records maintained by Clemmons; and blamed Clemmons for a freight-loading issue that would otherwise be attributed to inaccurate information from the customer. Further, as the Board noted, the ALJ observing Wachendorfer's demeanor during his live testimony did not think him credible. We cannot reject the agency's conclusion that Ameristar has simply attempted to manufacture facially legitimate reasons for termination when its true motive was retaliation, at least in contributing part.

The Board's conclusion is further supported by other evidence of pretext and by Ameristar's shifting defenses. If the trier of fact does not believe the employer to have given a truthful account of its decision, it is reasonable to infer that the most likely explanation is the one the employer cannot admit—that it acted for retaliatory or discriminatory reasons. "Thus," the Supreme Court has explained, "a plaintiff's prima facie case, combined with sufficient evidence to

---

[21] Although carrying significant weight, temporal proximity standing alone is not enough to sustain the plaintiff's ultimate burden. As we explain below, Clemmons met his burden in this case through temporal proximity combined with evidence of pretext. *Cf. Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001) ("[T]he close temporal proximity between [the plaintiff's] appearance at her co-worker's grievance hearing and her demotion, coupled with . . . evidence in the form of memoranda written by [the employer] that tend to refute [his] own justifications for the demotion . . . . supports an inference of retaliation.").

No. 10-60604

find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."[22]  Accordingly, because Clemmons has presented a *prima facie* case of retaliation and adduced evidence capable of rebutting Ameristar's proffered explanations, substantial evidence supports the Board's finding of liability.

## D

Ameristar also disputes the Board's rejection of its affirmative defense. Given the available evidence of pretext, we cannot deem Ameristar's evidence so overwhelming that a reasonable trier of fact would be compelled to agree that Clemmons would have been terminated in the absence of his protected activity, much less that Ameristar made such a showing by clear and convincing evidence.[23] Substantial evidence therefore supports the Board's conclusion that Ameristar did not carry its burden.

## IV

Although we affirm the Board's finding of an AIR21 violation and its decision to award back pay, there remain questions as to the period it used for the back pay calculation.  The agency awarded back pay from the date of Clemmons's termination through July 2004.  Ameristar insists that even if impermissible reasons contributed to its decision to fire Clemmons in January 2003, it nonetheless would have fired Clemmons for permissible reasons when

---

[22] *Reeves*, 503 U.S. at 148; *see id.* at 147 ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

[23] No party challenges the Board's reading of the affirmative defense as considering only the evidence that was available to the employer at the time of its decision, which excludes the insubordinate email that Ameristar was not aware of until several months later. *Cf. McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360–362 (1995) (after-acquired evidence of wrongdoing does not bar recovery of back pay).

it learned of the insubordinate email, so back pay may not continue past that date. The record reflects that Ameristar was aware of the email no later than March 28, 2003.

The Supreme Court has instructed that "where there is after-acquired evidence of wrongdoing that would have led to termination on legitimate grounds had the employer known about it," back pay should be limited to the period "from the date of the unlawful discharge to the date the new information was discovered."[24] The ALJ refused to apply this standard because it believed Clemmons's insubordination to have been provoked by Ameristar's actions. Perhaps, but that is not the proper inquiry. Ameristar raised the after-acquired evidence issue in its appeal to the Board, but the Board failed to address it. Because the question of whether Clemmons's insubordinate email "was of such severity that [he] would have been terminated on those grounds alone"[25] is a question of fact, we remand to the agency to make that determination and to adjust the back pay award if necessary.

AFFIRMED IN PART and REMANDED IN PART.

---

[24] *Id.* at 362.

[25] *Id.* at 362–63.