# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10567

United States Court of Appeals
Fifth Circuit

**FILED**
May 3, 2018

Lyle W. Cayce
Clerk

STEPHANIE WARREN,

      Plaintiff-Appellant

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, also known as Fannie Mae,

      Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:14-CV-3993

Before DAVIS, JONES, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Stephanie Warren appeals the district court's grant of summary judgment for defendant Federal National Mortgage Association ("Fannie Mae") on her claims for race discrimination under Title VII, Texas Labor Code Section 21.001 *et seq.*, and 42 U.S.C. Section 1981, the district court's exclusion of certain testimony, and the district court's dismissal of her defamation claim

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-10567

for improper venue.  After a full and careful review of the district court record, we find no abuse of discretion in the district court's evidentiary rulings. Further, because Warren fails to raise evidence of pretext, this court AFFIRMS the district court's grant of summary judgment on her discrimination claims. We REVERSE AND REMAND the district court's dismissal of her defamation claim.

## BACKGROUND

Fannie Mae is a private, federally chartered corporation that buys and sells mortgage loans.  Due to foreclosures, Fannie Mae also owns, manages, and resells real estate.  Fannie Mae employs sales representatives to manage and sell these foreclosed properties in different geographic regions, who in turn work with outside real-estate brokers in those regions.

Warren, an African-American woman, worked as a sales representative for Fannie Mae in Dallas from 1996 to 2013.  Her duties included managing properties, deciding how and when to sell properties, and working with outside brokers in her assigned territory.

Fannie Mae had a vetting process for outside brokers.  Brokers had to apply to Fannie Mae and verify information to be put on a list of available agents in each territory.  A broker would be "onboarded" upon the recommendation of the sales representative for that area.  Once approved, brokers gained access to Fannie Mae's "Asset Management Network" ("AMN"). Brokers receive a unique password to the AMN and are directed not to share it with anyone.

Fannie Mae takes steps to avoid conflicts of interest and the appearance of conflicts between its sales reps and outside brokers.  Sales reps are periodically assigned to new territories to reduce potential conflicts.  Fannie Mae's Code of Conduct (and attendant Conflict-of-Interest Policy) forbids the

2

appearance of impropriety or conflicts, and expressly forbids "giving one Fannie Mae vendor an inappropriate advantage over other vendors."

Warren was the sales representative for Virginia in 2010. As sales representative, Warren met Rhyan Finch, a Virginia real-estate broker who was ultimately approved to work on Fannie Mae's Virginia properties. Warren was reassigned from Virginia to Pennsylvania in 2011. Warren eventually needed to find additional brokers to assist with properties in western Pennsylvania. She requested a list of available brokers in the area, which listed only Emma Djiya. Warren contacted Djiya, who stated that she would be assisted by Finch. Warren also contacted Finch, who had previously offered to help Warren locate brokers in Pennsylvania. Finch told Warren that he would help Djiya get up to speed with the process and assist her with marketing properties. The emails Warren would later exchange with Finch are a central focus of this case.

On March 21, 2012, Finch told Warren that Djiya had applied to work as a Fannie Mae broker. Finch attached a referral form for Warren to submit to her manager, Marsha Peters. This form had Djiya's information filled in. Of note, Finch asked Warren to "delete my name from the email forwarding it on" and noted that "the email in the form . . . goes to me as well as the phone call." Warren later confirmed by e-mail that she had forwarded the form to Peters, though Warren stated in her deposition that she had instead forwarded a request to onboard Djiya.

Djiya was later approved as an outside broker. Finch soon after told Warren that he would be filling out Djiya's welcome paperwork. Warren also observed that when she sent emails to Djiya's email address, Finch, not Djiya, would respond. Warren testified that she could not remember whether she informed Peters of Finch's involvement with Djiya's affairs.

No. 17-10567

In 2012, Fannie Mae received a tip that another of its sales representatives had improperly favored Finch. Fannie Mae was told that Finch had received referral fees from other real-estate agents for referring Fannie Mae properties. Fannie Mae began an internal investigation, which determined that Finch and another outside broker named Spinetto had each collected split commissions from other Fannie Mae brokers, had created fake email addresses and phone numbers to receive communications directed to other brokers, and had accessed the AMN using other brokers' credentials. The investigation identified twelve sales representatives and managers, including Warren, who had worked with Finch or Spinetto.

Megan Chadsey conducted the investigation into Warren's interactions with Finch. Chadsey reviewed Warren's emails and interviewed Warren, Peters, and another manager who supervised specialists in Warren's group. Chadsey prepared an "Investigations Decision," which concluded that Warren had violated Fannie Mae's Code of Conduct and Conflicts-of-Interest Policy. The investigation determined that: (1) Warren favored Finch by "ensuring that he was able to conduct business in Pennsylvania"; (2) Warren created the impression that Fannie Mae condoned Finch's business practices; (3) Warren knew Finch had access to Djiya's AMN credentials and managed her day-to-day operations; and (4) Warren failed to raise concerns about these issues and actually concealed Finch's affiliation with Djiya.

The investigation focused on emails to support this final finding that Warren acted to conceal Finch's actions with Djiya. In one email chain, Finch asked if Peters knew he was working in Pennsylvania, noting that he was "not sure what she will think" and that he didn't want her to be surprised. Warren responded that Peters was "not aware that you're in this area yet because the broker source had all of [Djiya's] information," stating that she would tell

4

Peters during their next meeting. Warren was "[n]ot sure that [Peters would] be a big fan." Finch replied that he could send bids from Djiya's email so Peters wouldn't "need to know if you rather not bring it up . . . your call. The [Djiya] email comes to me too…. So I can stay below radar if that makes life easier just didn't want to say something on a call and put you in a bind."

Further, another Fannie Mae broker in Pennsylvania asked Warren if Djiya was working with a broker from Virginia in August 2012. Warren was not concerned about this question and did not tell management about the concern. Warren mentioned this inquiry to Finch to "make sure that [Djiya] was the person that was doing the day-to-day operation of the business." Finch responded (after a phone call with Djiya) that Djiya "hasn't spoken to anyone" and that she was "happy with how things are going and sees the value I bring to her business." Warren admitted that "she believed [Finch] asked her to conceal his affiliation with [Djiya]," but thought he did so because Peters disliked him.

Upon completion of the investigation, Fannie Mae fired Warren on February 7, 2013. Warren was one of four sales representatives fired, while three others received some remedial action.

Warren sued Fannie Mae in state court, alleging race discrimination and defamation. While that suit was pending she submitted her claims to nonbinding arbitration, as required by Fannie Mae's dispute resolution policy. The arbitrator dismissed Warren's state-law race discrimination claim as ineligible for arbitration and granted Fannie Mae a summary disposition on all remaining claims on the merits (despite Fannie Mae's argument that the defamation claim was untimely).

Fannie Mae then removed the case to federal court. The district court granted a motion to dismiss Warren's defamation claim for improper venue

No. 17-10567

pursuant to Federal Rule of Civil Procedure 12(b)(3) because Warren failed to timely submit her Demand for Arbitration as required by Fannie Mae's employment policies.  Fannie Mae then moved for summary judgment on all remaining claims, which the district court granted.  The district court's decision was based, in part, on the exclusion of information in Warren's summary judgment declaration under the sham affidavit rule.  The district court also struck the declaration of another Fannie Mae employee who had been fired as irrelevant.  Warren timely appealed.

## STANDARD OF REVIEW

This court reviews a "district court's evidentiary rulings when it determines the summary judgment record under an abuse of discretion standard." *Maurer v. Indep. Town*, 870 F.3d 380, 383 (5th Cir. 2017).

This court reviews a district court's grant of summary judgment *de novo*, applying the same standard on appeal as that applied below. *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  "[T]his court construes 'all facts and inferences in the light most favorable to the nonmoving party.'" *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).  But "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Id.* "We are not limited to the district court's reasons for its grant of summary judgment and may affirm the district court's summary judgment on any ground raised below

and supported by the record." *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 606-07 (5th Cir. 2014).

## DISCUSSION

Warren challenges the district court's grant of summary judgment, exclusion of Warren's summary judgment declaration under the "sham affidavit" rule, exclusion of Keitha Jefferson's declaration, and the district court's dismissal of her state-law defamation claim under Federal Rule of Civil Procedure 12(b)(3). We address the evidentiary rulings first, as they color the summary judgment analysis.

### I. Evidentiary Rulings

#### a. Warren's Declaration

The district court struck two paragraphs (paragraphs 20 & 22) from Warren's summary judgment declaration under the "sham affidavit" rule. "It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

Paragraph 20 of Warren's summary judgment declaration states that Warren "investigated" whether Djiya was managing the properties and she "received confirmation that Djiya or agents working in her officer [sic] were performing the Broker Price Opinion on the properties, and were supervising the arrangement for utilities and repair estimates. I learned that Finch was proofing the BPO's before they went out, but there was no prohibition to such quality control assistance." The district court found that this declaration conflicted with Warren's sworn deposition testimony, where she affirmed that she did not know if the utilities were in Djiya's name and that it was her understanding that the utilities were under Djiya's name. Because Warren

did not explain the discrepancy between her summary judgment declaration and her earlier testimony on this matter (certainty versus uncertainty), the district court excluded this paragraph.

Warren argues that the district court erred in excluding this paragraph because it focuses on her confusion during her deposition, which was later fixed with her declaration.  Warren ignores the fact that the next few lines of her deposition directly contradict her declaration.  When asked if she ever did anything to confirm that the utilities were under Djiya's name, Warren responded: "No, we did not get the billings in sales."  Warren has not, and cannot (given her clearly contradictory testimony and declaration), show that the district court abused its discretion by excluding paragraph 20 of her declaration.

Paragraph 22 of Warren's summary judgment declaration denies that she agreed to conceal Finch's connection to Djiya.  She also states that she "intended to mention Finch's involvement with Djiya to Peters when I next met with her, and may have actually done so, although I cannot remember with certainty.  I believe this happened because the investigator's notes reveal that someone told Peters that Finch was wanting to go 'under the radar,' which is terminology he used in an e-mail with me."  The district court found that this statement conflicted with Warren's earlier testimony that she did not tell Peters about Finch's connection with Djiya, and excluded it for failure to explain the discrepancy.

Warren argues, citing *Mutual Life Insurance Company of New York v. Hillmon*, 145 U.S. 285, 12 S. Ct. 909 (1892) that her consistent testimony that she intended to disclose the Finch-Djiya connection to Peters can be used as evidence that she later did so.  Warren also argues that her contradiction is explained by her viewing the investigator's notes, and "[r]efreshing memory

from a contemporaneous document is a perfectly legitimate reason" for changing testimony.

*Hillmon* looked at a declarant's words as evidence they later followed through with a plan. 145 U.S. at 294-95, 12 S. Ct. at 912. Warren is arguing that her post-conduct statements of intention imply that she actually told Peters about Finch. Therefore, *Hillmon* is inapposite. Warren's argument that viewing the investigator's notes refreshed her memory is also unavailing. Warren offers no explanation as to why seeing the investigator's notes from an interview with a third party reminded her that she "may have" told Peters about Finch after flatly denying that she told Peters about Finch in her deposition. Warren has not shown that the district court abused its discretion in excluding paragraph 22 of her summary judgment declaration.

### b. *Jefferson's Declaration*

The district court entirely excluded the declaration of Keitha Jefferson, another former Fannie Mae employee. Jefferson's declaration described her interactions with the same investigators who recommended that Warren be terminated. Fannie Mae argued that Jefferson's declaration was irrelevant, prejudicial, hearsay, not based on personal knowledge, and improper opinion testimony, while Warren contended that the declaration showed the investigator's bad faith.

The district court concluded that Jefferson's declaration was excludable because it had no evidentiary value outside of attacking the investigators' credibility, and credibility determinations are not allowed at summary judgment. *See Anderson*, 477 U.S. at 255. The district court also held that, notwithstanding the inadmissibility of credibility evidence, Jefferson's declaration was unrelated to the facts in Warren's case because Jefferson and Warren had different jobs, were fired for different reasons, and raised different

claims.   Thus, the district court determined that "[n]othing in Jefferson's Declaration is probative of whether Fannie Mae discriminated against Warren because of race."   *Warren v. Fed. Nat'l Mortg. Ass'n*, No. 3:14-CV-3993-B, 2017 WL 1365785, at \*8 (April 14, 2017 N.D. Tex).   The district court also observed that many of Jefferson's statements were conclusory allegations.  *Id.*

We agree that, regardless whether any evidence regarding credibility and credibility determinations is absolutely barred at summary judgment, the district court did not abuse its discretion in finding that Jefferson's statements regarding the investigation process for her complaints of retaliation and discrimination on the basis of disability do not tend to prove or disprove that Fannie Mae discriminated against Warren because of her race.   Further, the district court did not abuse its discretion by concluding that much of Jefferson's declaration was merely conclusory, such as her *belief* that the investigators have "poor reputations for truthfulness, and all investigations that were either conducted or reviewed by them should be considered a sham along with being called into question as to their reliability."

## II.  Summary Judgment

Warren claims that Fannie Mae discriminated against her because of her race in violation of Title VII, 42 U.S.C. Section 1981, and the Texas Labor Code Section 21.001 *et seq.*

Because Warren has not offered any direct evidence, this court applies the modified *McDonnell Douglas* burden-shifting standard.   *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). Warren must first demonstrate a *prima facie* case of discrimination; she must show that she: (1) is a member of a protected class, (2) was qualified for the position at issue, (3) was discharged or suffered some adverse employment action by the employer, and (4) was replaced by someone outside her protected

No. 17-10567

group or was treated less favorably than other similarly situated employees outside the protected group. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). If Warren can make out a *prima facie* case, the "burden then shifts to the employer to articulate a legitimate, nondiscriminatory . . . reason for its employment action." *Id.* at 557. This burden is one of production, not persuasion and does not involve a credibility assessment. *Id.* Once the employer states its reason, the burden shifts back to the plaintiff. The plaintiff must then create a genuine, material fact issue either that the employer's reason is false and merely pretext for discrimination, or that while the employer's reason is true, it is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Burrell*, 482 F.3d at 411-12.

Fannie Mae assumed that Warren established a *prima facie* case, and the parties agree that Fannie Mae has proffered a legitimate, nondiscriminatory reason for terminating Warren. Therefore, the court turns to Warren's arguments to show that Fannie Mae's reason for terminating Warren was pretextual or one of several motivating factors, including her race. Warren contends that there are ten facts or fact issues that should have precluded summary judgment on her race discrimination claims. The court addresses them in the order she raises them.

*1. Fannie Mae Deviated from Progressive Discipline Procedures*

Warren argues that Fannie Mae deviated from its normal procedure for using progressive discipline when it decided to terminate her without looking at her work history. She notes that an employer's deviation from its typical procedures can imply discrimination. *Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013). The district court noted, correctly, that the document Warren points to as a "progressive discipline policy" is not a progressive

11

No. 17-10567

discipline policy, but rather, an appendix to Fannie Mae's Investigation Procedure. *Warren*, 2017 WL 1365785, at *12. The document states that the listed "criteria are instructive, but not determinative" and any "Directed Action is dependent on the specific facts and circumstances of the violation." Fannie Mae could not violate a progressive discipline policy it did not have. Therefore, this argument does not suggest Warren's termination was motivated discriminatory intent.

### 2. *Lack of Training*

Warren next contends that Fannie Mae failed to train her to know that her interactions with Finch were improper. She points to Shirley Small, another sales representative, who could not recall being told that a consulting arrangement like Finch's was forbidden. Warren's argument proves too much. Warren was as untrained as her coworkers. Warren has not alleged that she received less training than similarly situated employees outside her group (such as Shirley Small). Accordingly, her lack of training does not raise an inference of pretext or discriminatory intent.

### 3. *Warren Kept Peters Informed*

Warren argues that her termination for concealing Finch's relationship with Djiya is contradicted by the record. Warren contends that her repeated intentions to inform Peters about Finch and the inclusion of the "under the radar" language from Finch's correspondence with Warren have led her to believe that she actually did disclose Finch's actions to Peters. As discussed above, Warren's contentions that she told Peters about Finch were properly excluded under the sham affidavit rule. The record does, however, contain Warren's deposition in which she flatly denies telling Peters about Finch. She may not backtrack on this previous statement now. Accordingly, Warren has

not offered facts to indicate she did not conceal Finch's relationship with Djiya to raise an inference of pretext or discriminatory intent.

### 4. Selective or Preferential Enforcement of Policies

Warren next argues that her termination for concealment was pretextual or motivated by discriminatory intent because Fannie Mae selectively enforced its policies and treated similarly situated employees differently. To raise even a *prima facie* case of disparate treatment, Warren must identify a similarly situated comparator. *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009). Employees are similarly situated if: (1) they "held the same job or responsibilities"; (2) they worked for "the same supervisor or had their employment status determined by the same person"; (3) they had "essentially comparable violation histories"; and "critically" (4) the employees' conduct drawing adverse consequences was "nearly identical" but resulted in "dissimilar employment decisions." *Id.* at 260. The converse is also true. Employees are not similarly situated if they: (1) had different supervisors; (2) worked for different divisions within the company; (3) held different responsibilities; (4) suffered adverse actions for dissimilar conduct; or (5) suffered adverse actions too remote in time from each other. *Id.* at 259-60. "If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260 (quotations omitted).

Warren argues that Fannie Mae ignored "an identical infraction" by Brian Kapprell, a white male employee who worked with Spinetto, and reprimanded, but did not fire, Shirley Small, a white woman who worked with Finch.

Warren alleges (via declaration from Lynette Sandidge, another terminated employee) that her first comparator, Brian Kapprel, engaged in the same conduct she did, but was not fired.  Fannie Mae responds that Kapprel was found to have improperly favored a vendor, but their investigators did not find that he had concealed his actions as Warren did.

Warren's argument that Kapprel is an apt comparator relies on her contention that she did not conceal her dealings with Finch and his relationship with Djiya.  There are no facts in the record to suggest that Kapprel and Warren engaged in the same behavior.  Conspicuously absent from the investigation record into Kapprel's conduct is any scintilla of evidence that he *concealed* his relationship with Spinetto or Spinetto's relationships with other brokers.  The investigators found "no evidence indicating that Mr. Kapprel tried to obscure the [broker's] affiliation with these agents from Fannie Mae management.  Instead, . . . the evidence showed that he forwarded emails that indicated this affiliation to his manager and a Corporate Procurement representative."  Warren claims that she and Kapprel engaged in the same conduct, but this discounts the finding that Kapprel forwarded information to management regarding his outside broker.  Because the undisputed facts show that Kapprel and Warren engaged in dissimilar conduct, Kapprel is not an adequate comparator.

Warren's second comparator is Shirley Small, a white, female sales representative who engaged in similar conduct involving Finch.  Warren argues that the investigation decisions for her and Small show that their conduct was "essentially identical," but she was fired while Small was spared.  To show the similarity between her behavior and Small's, Warren cites: (1) Chadsey's investigation notes in which Chadsey purportedly "admitted . . . that Warren's conduct was closer in nature to Shirley Small than Sandidge,

and only justified its severity due to the alleged concealment, which didn't happen"; and (2) Finch's deposition where he states that Warren and Small engaged in essentially identical conduct.

Warren's argument mischaracterizes Chadsey's notes, which mention that Warren's case is "more severe than Small" due to concealment, but not likely as severe as Sandidge's because Warren's case did not involve "a lot of brokers/states." This is not an admission that Warren's conduct was closer to Small's. Warren's argument on this point also flatly denies that she concealed information from management, but cites nothing in the record to support this contention. Further, Finch's testimony is not adequate to demonstrate that Warren and Small engaged in similar conduct. While Finch stated that Warren and Small were "doing the same thing," he admitted that he had reviewed neither Warren's nor Small's investigation decision. Finch's testimony also does not contradict the undisputed fact that Warren testified she did not reveal Finch's relationship to Djiya despite receiving concerns from other brokers. There is nothing in the record to suggest that Small had similar concerns presented to her. Further, Warren admitted to Chadsey that "she believed that [Finch] had asked her to conceal his affiliation with [Djiya] from her manager." There is nothing in the record suggesting that Small held a similar belief and failed to disclose Finch's affiliations to management. The undisputed facts show that Small and Warren engaged in dissimilar conduct. Therefore, Small is not an adequate comparator. Accordingly, Warren has not adduced sufficient facts concerning selective or preferential enforcement of policies to raise an inference of pretext or discriminatory intent.

*5. Executive and Manager Approval*

Warren next contends that evidence of Fannie Mae's managers' approving conduct that she engaged in, which was then called a violation of

policy, shows pretext.  She cites *Ameristar Airways, Inc. v. Administrative Review Board, United States Department of Labor*, 650 F.3d 562 (5th Cir. 2011), to support this statement of law.  She contends that Fannie Mae Vice President David Box approved Spinetto's backoffice service consulting and that Director Peter Poidmani actively sought help from Spinetto in onboarding new brokers in Chicago (when Spinnetto was based in Virginia).

First, *Ameristar* does not stand for the proposition for which Warren cites it.  Rather, the *Ameristar* court found that when an employer cited inadequate work product as a reason for taking adverse action against an employee, where that work product had "already been approved and conformed to prior management directives," an inference arose that the employer had "simply attempted to manufacture facially legitimate reasons for termination when its true motive was retaliation." *Ameristar*, 650 F.3d at 569.  *Ameristar* does not apply to the facts of this case.  Warren has not contended that a manager outright approved her conduct, nor has she alleged that Box's and Poidmani's conduct followed a "prior management directive."  Instead, she focuses on the fact that neither Box nor Poidmani was investigated or disciplined for their interactions with Spinetto.

To the extent that Warren is claiming Box and Poidmani are comparators, this argument fails.  Box, a Vice President, and Poidmani, a Director, are not similarly situated to Warren, a sales representative.  As the district court noted, Fannie Mae was entitled to make potentially irrational or unfair decisions (such as not investigating Box and Poidmani) so long as their decisions were not discriminatory. *Warren*, 2017 WL 1365785, at \*16 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)).  The undisputed record reflects that Fannie Mae investigated all sales representatives with ties to Spinetto or Finch.  Warren's invocation of conduct

by Box and Poidmani raises no inference that Fannie Mae discriminated against *her*.

### 6. *Fact Issues Exist on AMN Access Policy*

Warren contends that summary judgment should have been precluded due to fact issues regarding Fannie Mae's policy on brokers' sharing their AMN passwords. This argument presents no evidence of racial animus. Rather, Warren is taking issue with Fannie Mae's conclusion that her conduct was improper. This argument ignores Fannie Mae's actual justification for her termination: the finding that she "attempted to *conceal*" Finch's relationship with Djiya. "[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision." *Bryan v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). This argument fails to raise an inference of pretext or discriminatory intent.

### 7. *Finch Actively Promoted Services Without Management Guidance*

Warren's seventh argument focuses on the fact that Finch apparently came to Fannie Mae's Dallas office to promote his backoffice services without objection from management. Even if this were true, (and the district court noted that "the evidence Warren points to in support of [this] claim, Finch's deposition, does not much support it,") this fact does nothing to demonstrate that her termination was motivated by racial animus towards her. *Warren*, 2017 WL 1365785, at *16.

### 8. *Box Video Shows Conflicts Rule Enforced Selectively*

Warren's next argument contends that "a jury [could] reasonably doubt Fannie Mae's sincerity about never favoring one REO broker over another" because Box chose Spinetto to appear in a commercial in Maryland, although Spinetto was not licensed in Maryland. As discussed above, Box is not a valid

comparator due to his position. That Box had Spinetto appear in a commercial is also not comparable to Warren's conduct because there is no indication that he was concealing any alleged conflict. Commercials are widely distributed, not concealed. This argument is meritless and fails to raise an inference of pretext or discriminatory intent.

### 9. Biased Investigators Preclude Summary Judgment

Warren's penultimate argument claims that Meghan Chadsey and Leslie Arrington, Fannie Mae's investigators, "were partial, and deliberately ignored evidence favoring minorities to justify their results." To support her claim of partiality, Warren cites the omission of Peters' statement that someone told her Finch was trying to "stay under the radar," Jefferson's testimony that Chadsey prepared her investigation report before meeting with Jefferson, and Sandidge's experience with a third investigator. The investigators' notes and their omission from Warren's investigation decision do not create a material factual dispute or allow an inference that Fannie Mae harbored racial animus. This argument instead rehashes Warren's disagreement with Fannie Mae's conclusion that she concealed information, which fails to raise a material factual dispute for the reasons discussed above. Jefferson's declaration is irrelevant for the reasons discussed above, as is the experience of another employee with a *different investigator*. This argument fails to raise an inference of pretext or discriminatory intent.

### 10. Knowledge of Race

Warren's final argument takes issue with "Fannie Mae's assertions of ignorance on the racial disparity of the harm . . . in light of the investigator's selective attention to rule-breaking." She contends that the investigators met with Fannie Mae Vice President John Liszka "who presumably knew the race of the various employees, and identified them for investigation" and that

"Chadsey and presumably Arrington knew Warren was African American shortly after the termination." Warren's arguments regarding selective enforcement do not hold water, as discussed above. The investigators' notes regarding the meeting with Liszka make no mention of race, so that consultation raises no inference of discrimination. Finally, Warren's contention that the investigators knew her race after her termination is irrelevant. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015) ("[A]fter-acquired *knowledge* cannot be the basis of the [employer's] decision.") (quotation omitted). This argument fails to raise an inference of pretext or discriminatory intent. Accordingly, because no disputes of material fact exist, the district court's grant of summary judgment for Fannie Mae must be affirmed.

### III.    Federal Rule of Civil Procedure 12(b)(3) Dismissal

Warren's last point of error argues that the district court erred in dismissing her state law defamation claim for improper venue under Federal Rule of Civil Procedure 12(b)(3). Warren argues that the district court contravened Supreme Court precedent dictating that a forum-selection clause may not be enforced via Rule 12(b)(3). *See Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 55 134 S. Ct. 568, 577 (2013) ("Rule 12(b)(3) allow[s] dismissal only when venue is 'wrong' or 'improper.' Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause."). Warren argues that Fannie Mae's motion to dismiss under 12(b)(3) was moot when filed because she timely filed her defamation lawsuit before seeking arbitration. Warren further notes that the arbitrator decided her defamation

claim on its merits, and thus, the district court was not in a position to decide whether her claim was properly or timely before the arbitrator.

Fannie Mae counters that: (1) Warren failed to preserve any error below; (2) *Atlantic Marine* is inapplicable in this case; (3) the district court's reliance on Rule 12(b)(3) is immaterial because the district court could have simply converted its motion to a motion for summary judgment and reached the same result; and (4) the district court was correct in dismissing the defamation claim because it was not timely submitted to arbitration. As to timeliness, Fannie Mae notes that Warren filed her Demand for Arbitration on March 20, 2014, but alleged that Fannie Mae's defamatory statements prevented her from getting a job at Freddie Mac in February 2013. This would put her Demand for Arbitration past the one-year statute of limitations for defamation claims in Texas. *See* Tex. Civ. Prac. & Rem. Code § 16.002(a).

Fannie Mae correctly notes that arbitration agreements are a "specialized kind of forum-selection clause." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519, 94 S. Ct. 2449, 2457 (1974). However, the district court and Fannie Mae have overlooked the language of the arbitration agreement, which cleanly disposes of this argument. Fannie Mae's Dispute Resolution Policy requires that employees must engage in nonbinding arbitration of claims with Fannie Mae as a prerequisite to suit. Regarding timeliness, the policy requires that the arbitrator "receive the employee's completed 'Demand for Arbitration' form within the time limit set by law for bringing suit on that claim in court." "If the company contends that the claim was not made within the time limit, the arbitrator may be requested to decide the issue before any hearing on the substance of the claim." Further, "[t]he arbitrator will resolve all disputes over the interpretation and applicability of the [Dispute Resolution] Policy, and over the arbitrability of all matters presented under it."

Fannie Mae alleged two bases for summary disposition on Warren's defamation claim to the arbitrator: (1) that it was ineligible because she filed it out of time; and (2) she had not established her claim. The arbitrator assumed her claim was eligible and dismissed the claim on its merits for failure to establish the necessary elements. The arbitrator's decision to dismiss Warren's claim on the merits and assumption it was timely implicitly determined the arbitrability of Warren's defamation claim. As noted above, the arbitrator was entitled to "resolve all disputes . . . over the arbitrability of all matters presented under [the Dispute Resolution Policy]." Therefore, the district court attempted to override the arbitrator's determination of arbitrability when it found that Warren's claim was untimely. The district court erred in doing so. Accordingly, this court will vacate and remand the district court's dismissal of Warren's defamation claim for disposition on the merits, in light of the nonbinding decision of the arbitrator.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's evidentiary rulings and grant of summary judgment for Fannie Mae on Warren's race discrimination claims, but **REVERSE AND REMAND** the district court's dismissal of Warren's defamation claim.