

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

No. 08-25-00083-CV

The University of Texas at El Paso, Appellant

v.

Sergio Aranda, Appellee

On Appeal from the County Court at Law No 3
El Paso County, Texas
Trial Court No. 2023DCV2363

## OPINION

The Texas Commission on Human Rights Act (TCHRA) provides a limited waiver of governmental immunity, creating an avenue for claimants to pursue discrimination claims against employers that would otherwise be immune. This is an accelerated interlocutory appeal from the denial of a combined plea to the jurisdiction and summary judgment motion filed by Appellant University of Texas at El Paso (UTEP). Appellee Sergio Aranda suffers from amaxophobia, a fear of driving, and claims UTEP disqualified him from the application process during a phone call

because it regarded him as disabled. On appeal, UTEP challenges the evidence supporting Aranda's discrimination claim as insufficient to establish a waiver of sovereign immunity. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Aranda applied for a Police Communications Operator (PCO) position with the UTEP Police Department (UTPEP PD) on January 1, 2022. As an institution of the University of Texas System (the UT System), UTEP follows the policies of the UT System Office of Department of Police (ODOP). The required documents for the PCO position appear in two places—ODOP policy 401B and form DP52TC. Policy 401B is ODOP's policy and procedure manual titled, "Application Selection Process for Employment as a Telecommunicator." Policy 401B outlines the selection process, the qualification standards and disqualifiers, and the required documentation for the position. As for ODOP form DP52TC, it is an index of the documentation applicants are required to submit. As part of the application process, UTEP's HR office conducts an initial assessment of applicants, and those who meet the initial assessment go on to the next stage for a background investigation conducted by a UTEP PD investigator. The PCO job was posted by both the UT System and UTEP, and each posting included the position's required qualifications, duties, and essential functions.

Mark Shouse was the background investigator for UTEP PD, and his duties included performing background investigations and collecting employment documents from applicants. About a month after Aranda submitted his application, Shouse emailed him to request required documents. Aranda responded the next day, explaining that he could not open one of the forms due to Adobe Acrobat issues and requested assistance. Aranda added: "Also, since I do not drive,

2

do I still need to request a driving record with Municipal Court? please advise, thank you kindly."
Shouse then called Aranda, and the two spoke for about four minutes.

The parties offer conflicting accounts of the phone call. According to Aranda, Shouse asked why he did not have a driver's license. Aranda says he explained that he suffered from a mental issue that caused him to fear driving, and that after hearing this, Shouse told him that driving was required and he could not continue with the application process. UTEP maintains that Aranda did not disclose a disability, and that Shouse did not disqualify Aranda from the application process. It is undisputed, however, that following the call, Shouse did not continue with the application process and was not hired by UTEP. Shouse later notified two of his superiors that Aranda had complained of discrimination; UTEP did not investigate. About six months after the call took place, a UT System ODOP inspector emailed officials at different UT System universities. In it, the ODOP inspector reported that a campus had disqualified an applicant for lacking a driver's license, acknowledged that the UT System job description did not include that requirement, noted that campuses had discretion to impose such a requirement in certain conditions, and updated the index for the PCO position to clarify that a driver's license was not required.

Aranda filed a discrimination charge with the Equal Employment Opportunity Commission in May, alleging disability discrimination based on his amaxophobia. In its response to the EEOC, UTEP denied discrimination. It asserted that Aranda merely disclosed he "did not like to drive on the highway," that it "requires PCO applicants to obtain and provide a copy of their driving history record from the El Paso Municipal Court," and alluded that driving might be required. After receiving a right-to-sue letter, Aranda sued UTEP for disability discrimination and failure to accommodate. UTEP responded with a plea to the jurisdiction, arguing that Aranda could not assert his claims because fear of driving was not a qualifying disability. Aranda then amended his

petition to assert only a "regarded as" discrimination claim under the TCHRA. The parties proceeded with discovery, including witness depositions.

UTEP later filed its "Plea to the Jurisdiction, Traditional Motion for Summary Judgment, and No-Evidence Motion for Summary Judgment" (combined plea and motion), arguing that Aranda failed to show a genuine issue of material fact on his prima facie claim or to rebut UTEP's legitimate, nondiscriminatory reasons. The trial court denied the combined plea and motion. This interlocutory appeal followed. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (allowing for an interlocutory appeal of a ruling on a plea to the jurisdiction by a governmental unit).

## II. APPLICABLE LAW AND STANDARD OF REVIEW

### A. Plea to the jurisdiction and sovereign immunity

A plea to the jurisdiction challenges a trial court's subject matter jurisdiction. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 232 (Tex. 2004). It is a dilatory plea that can defeat a cause of action without regard to the merits of the asserted claims. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Subject-mater jurisdiction cannot be conferred or taken away by consent or waiver unless the Legislature has expressly waived immunity. *Carroll v. Carroll*, 304 S.W.3d 366, 367 (Tex. 2010).

A plea to the jurisdiction based on sovereign immunity properly challenges a trial court's subject matter jurisdiction. *Miranda*, 133 S.W.3d at 225–26. Through the enactment of the TCHRA, the Texas Legislature waives immunity for certain governmental employers. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). As a state university, UTEP is a governmental employer protected by sovereign immunity. *See* Tex. Educ. Code. Ann. §§65.02(a)(4); 69.02; Tex. Gov't Code Ann. § 311.034; *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 135 (Tex .2015). In a suit against a governmental employer, like UTEP, the prima

4

facie case implicates both the merits of the claim and the court's jurisdiction because of the doctrine of sovereign immunity. *Mission Consol.*, 372 S.W.3d at 636. Sovereign immunity deprives a trial court of jurisdiction over suits in which the governmental employer has been sued, absent consent. *Id.* at 636.

The Texas Legislature, by its enactment of the TCHRA, "clearly and unambiguously waives immunity" for governmental employers like UTEP, but the waiver applies "only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Mission Consol.*, 372 S.W.3d at 636, 660. Absent pleadings establishing a prima facie case, the governmental employer's immunity from suit has not been waived. *Id.* at 636.

"A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). We must accept the allegations in the pleadings as true and construe them liberally in the plaintiff's favor. *Miranda*, 133 S.W.3d at 226. The plaintiff has the burden of establishing facts that affirmatively show the trial court has jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). If the plea challenges the existence of jurisdictional facts, such as here, we must move beyond the pleadings and consider the evidence. *Miranda*, 133 S.W.3d. at 227. This standard mirrors that of summary judgment, which requires that a plaintiff raise a genuine issue of material fact to avoid dismissal when his factual allegations are challenged with supporting evidence. *Alamo Heights*, 544 S.W.3d at 771. "In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Id.* We review a trial court's jurisdictional ruling de novo. *Id.* at 226.

**B.** *McDonnel Douglas* **framework**

Under the TCHRA, an employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age, the employer:

(1) fails or refuses to hire an individual . . . or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive an individual of any employment opportunity[.]

Tex. Lab. Code. Ann. § 21.051. In interpreting the TCHRA's disability discrimination provisions, Texas courts look to the Americans with Disabilities Act (ADA). *Austin State Hosp. v. Kitchen*, 903 S.W.2d 83, 88 (Tex. App.—Austin 1995, no writ). The ADA provides protection to qualified individuals "in regard to job application procedures, hiring," and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

A plaintiff may rely on either direct or circumstantial evidence to establish a prima facie case of unlawful discrimination; however, "direct evidence of discriminatory intent is typically 'hard to come by[.]'" *Tex. Tech Univ. Health Scis. Ctr. El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (quoting *Mission Consol.*, 372 S.W.3d at 634). If a plaintiff relies on circumstantial evidence, as is the case here, to establish his prima facie discrimination claim, we follow the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id*. Under the *McDonnel Douglas* framework, (1) the plaintiff must first create a presumption of illegal discrimination by establishing a prima facie case; (2) the defendant must then rebut that presumption by establishing a legitimate, non-discriminatory reason for the adverse employment action; and (3) the plaintiff must then overcome the rebuttal evidence by establishing that the defendant's stated reason is a pretext. *Id*. We consider the trial court's jurisdiction by first inquiring whether Aranda met his burden of establishing a prima facie case.

*San Antonio*, 461 S.W.3d at 135–36. Then, if he has, the burden shifts to UTEP to articulate a legitimate, non-discriminatory reason for its differential treatment. *McDonnel*, 411 U.S. at 802. If UTEP articulates a legitimate, non-discriminatory business reason for the differential treatment, the burden shifts back to Aranda to show that reason is a pretext for discrimination. *Id*.

## III. ANALYSIS

In its sole issue on appeal, UTEP contends the trial court erred in denying its combined plea to the jurisdiction and summary judgment motion as to Aranda's "regarded as" claim. UTEP advances three arguments in support: (1) Aranda failed to establish a prima facie case of disability discrimination and did not suffer an ultimate employment decision; (2) UTEP produced evidence of a legitimate, nondiscriminatory business reason; and (3) Aranda failed to produce evidence that UTEP's stated reason was a pretext for discrimination.[1] We address each argument in turn.

### A. Aranda met his burden to establish a prima facie case of discrimination.

A plaintiff must first establish a prima facie case of disability discrimination to invoke waiver of a governmental employer's sovereign immunity. *El Paso Cnty. v. Vasquez*, 508 S.W.3d 626, 638 (Tex. App.—El Paso 2016, pet. denied) (citing *San Antonio*, 461 S.W.3d at 136). A "disability" is defined as (1) "a mental or physical impairment that substantially limits at least one major life activity"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." Tex. Lab. Code. Ann. § 21.002(6). To bring a "regarded as" claim under the TCHRA, a plaintiff must assert that he (1) was perceived as having an impairment; and (2) was discriminated against based on that perceived impairment, regardless of whether he truly is impaired. *Texas Tech Univ. Health Scis. Ctr.–El Paso v. Niehay*, 671 S.W.3d 929, 935–36

---

[1] UTEP presents these points as four separate issues; we consolidate them into a single issue with three supporting arguments.

(Tex. 2023). A plaintiff does not have to "present evidence that the [perceived] impairment 'substantially limits at least one major life activity.'" *Dallas Cnty. Hosp. Sys. v. Kowalski*, 704 S.W.3d 550, 554 (Tex. 2024). "For regarded-as claims, the Labor Code defines '[d]isability' as 'a mental or physical impairment.'" *Niehay*, 671 S.W.3d at 936. We are tasked with determining whether Aranda satisfied his burden to establish a genuine issue of material fact as to whether UTEP perceived him as impaired—regardless of whether he truly was and regardless of whether that impairment substantially limited a major life activity—and whether UTEP disqualified him from the application process based on that perception. *Kowalski*, 704 S.W.3d at 544.

UTEP argues that Aranda cannot establish a prima facie case because he cannot show that UTEP regarded him as impaired or that Shouse took any adverse employment action against him. In support of its combined plea and motion, UTEP submitted Shouse's affidavit, selected deposition excerpts of Aranda, Shouse, and UTEP PD Chief of Police Clifton Walsh, Aranda's application materials, and Aranda's EEOC charge.

Aranda counters that the evidence raises genuine issues of material fact to preclude dismissal of his claim. To resist dismissal, Aranda submitted a wide range of documents, including deposition transcripts from himself, Shouse, Walsh, and UTEP HR Director Arizve-Ochoa Retana; UTEP and UT System training materials, policies, and job descriptions for the PCO position; job postings and application-related documents for the PCO position; emails, calls logs, and submission records; an email from an ODOP inspector; correspondence and filings connected to Aranda's EEOC charge; and UTEP's EEOC position statement.

### (1) UTEP perceived Aranda as impaired.

We first determine whether UTEP perceived Aranda as impaired. Aranda asserts that UTEP discriminated against him because it perceived him as having a mental impairment—

amaxophobia. UTEP counters that the record does not show this. UTEP relies heavily on the testimony of Shouse, who stated that he could not have formed a perception that Aranda was impaired based on their limited interaction over a short phone call. According to UTEP, Shouse "never met Aranda in-person. He never observed Aranda refusing to drive out of fear or anxiety. He never observed Aranda in an anxious or fearful state because of his alleged amaxophobia." However, the standard is not whether the employer actually witnessed the impairment or its symptoms. Rather, the proper inquiry is whether UTEP believed Aranda was impaired. *See Kowalski*, 704 S.W.3d at 544 (reversing plea to the jurisdiction on plaintiff's regarded-as claim because "[n]umerous internal communications were produced below, but none of them provide any evidence that Parkland [the employer] believed—contrary to what both Kowalski herself and her chiropractor said—that she was disabled").

Shouse confirmed that before calling Aranda, he had Aranda's application, resume, and cover letter. Earlier that day, Aranda emailed Shouse reporting difficulty opening a form and further stating that he did not drive.[2] That same afternoon, Shouse called Aranda. The call lasted 4 minutes and 23 seconds.

UTEP relies on the testimony of Shouse to show that it did not, and could not have, perceived Aranda as impaired. Shouse testified that when he first learned via email that Aranda did not drive and was having trouble opening a form, his intent in contacting Aranda was to assist him with opening the form. According to Shouse, he introduced himself to Aranda, asked about the form, and claimed Aranda "brought up the driver's license. I believe. I don't recall exactly."

---

[2] In its EEOC position statement, UTEP claimed that "Mr. Shouse sent Mr. Aranda an email on February 10, 2022, with instructions for completion of the DP1 [the 'Personal History Statement' required form], and informed him of additional documents which needed to be submitted by Mr. Aranda at his scheduled 9:00 a.m. appointment on February 25, 2022." However, Shouse's email only stated: "Please open and read the attachments carefully. If no longer interested please notify me by e mail."

Shouse testified he asked Aranda, "You don't have to answer this, but is there a reason you don't have a driver's license?" When asked why he told Aranda that he did not have to answer, Shouse responded, "It's not a policy. It's more of a courtesy." Though Shouse characterized this as a "courtesy," UTEP's "best practices" policy requires employees to ensure "a fair and equitable selection process" that specifically instructs "[n]ot asking questions about . . . disability . . . or any other potentially discriminatory topics." According to Shouse, Aranda responded with "something to the effect that it causes him anxiety," and did not use the terms "disability," "mental condition," or "phobia." Shouse testified he could not recall what was said next.

Aranda offered a contradicting account and maintains that the following testimony from his deposition raises a material fact issue as to whether UTEP perceived him as impaired. According to Aranda, Shouse is the one who raised the topic of a driver's license, and the conversation went as follows:

> So, like, you don't have a driver's license? And I'm, like, no, sir. I don't. And he asked, can I ask the reason why? And . . . I'm, like, well, you know what, sir, I have a mental issue. I really feel uncomfortable driving. I never drove in a vehicle, because I have a fear of driving every time I'm in front of the wheel. I experience a lot of anxiety, mental anguish, shortness of breath. Basically, yeah. I told him that because I just can't drive. I couldn't obtain my driver's license. And he's, like, well, Mr. Aranda, I understand that. But you have to have a license to move forward with the process.

UTEP's main contention is that Shouse's "undisputed testimony reveals that he did not form a perception that Aranda was impaired." We disagree. To begin, Shouse's testimony is disputed by Aranda. Although no magic words are required, Aranda testified that he told Shouse he had a "mental issue," a "fear of driving," and further explained his condition to Shouse by describing symptoms, including anxiety and shortness of breath. We find that the testimony of Aranda and Shouse creates a fact issue as to whether Aranda sufficiently disclosed his mental impairment to Shouse and whether UTEP believed Aranda was impaired.

10

UTEP also maintains that even if more precise wording was used by Aranda, Shouse was not the final decision maker, and "[t]he record evidence does not demonstrate that Officer Shouse provided information to an actual hiring decisionmaker at UTEP from which they could form the perception that Aranda was impaired." We reject this argument, as the United States Supreme Court has recognized agency principles in this context and held that employers can be liable for the discriminatory acts of their agents. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer."); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 57 (1986) (recognizing "Congress' decision to define "employer" to include any "agent" of an employer"); Tex. Labor Code Ann. § 21.002(8) (defining "employer" as including "an agent" of the employer). Moreover, Aranda acknowledged at the hearing on the combined plea and motion that Shouse was "clearly" an agent of UTEP.

We similarly reject UTEP's argument that Aranda did not suffer an "ultimate employer decision" because Shouse "lacked the authority to take such actions" and "Aranda never made it to the applicant consideration process."[3] The evidence shows that Aranda submitted an application and was in the application process, and "[u]ltimate employment decisions that are actionable

---

[3] The Fifth Circuit has abandoned the ultimate employment decision requirement for Title VII cases. *See Hamilton v. Dallas Cnty.*, 79 F.4th 494, 499–502 (5th Cir. 2023). However, as our sister court has stated, "Fifth Circuit precedent, although persuasive authority, is not binding on this Court. In the absence of contrary authority from the Texas Supreme Court or this Court sitting en banc, we continue to be bound by our prior precedent holding that the TCHRA's anti-discrimination provision only applies to 'ultimate employment decisions.'" *City of Pasadena v. Poulos*, No. 01-22-00676-CV, 2023 WL 7134974, at *10 n.1 (Tex. App.—Houston [1st Dist.] Oct. 31, 2023, no pet.) (mem. op); *see Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see also Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022) (stating that under principles of horizontal stare decisis, panel of appellate court must follow "materially indistinguishable decisions of earlier panels of the same court" unless prior decision has been superseded by higher authority, such as decision by Texas Supreme Court or "an en banc decision of the court of appeals itself"). We follow binding Texas Supreme Court precedent requiring an ultimate employment decision.

include decisions to hire." *Elgaghil v. Tarrant Cnty. Junior Coll.*, 45 S.W.3d 133, 143 (Tex. App.—Fort Worth 2000, pet. denied).[4]

We find that the evidence raises a fact issue as to whether UTEP believed Aranda was impaired. We now turn to determine whether UTEP disqualified Aranda because it perceived him as impaired.

### (2) UTEP disqualified Aranda because it perceived him as impaired.

Aranda had to show that he was prohibited from proceeding with the application process because UTEP perceived him as impaired. *Niehay*, 671 S.W.3d at 935–36. To establish this element, Aranda must only prove that his perceived impairment was a motivating factor in the differential treatment. *Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001).

Aranda argues that "Shouse's conduct following Aranda's mental impairment disclosure strongly supports an inference that he perceived Aranda as disabled" and "only after Aranda explained that he could not drive due to his mental impairment did Shouse abruptly declare that a driver's license was required and that Aranda could not proceed in the application process." Aranda maintains that when Shouse called him, he knew only that Aranda did not drive but did not yet know why; at this point in the conversation, Shouse had not yet said that driving or a driver's license was required. Shouse confirmed that he first learned that Aranda did not drive via email—before the call. Aranda testified that after he disclosed his "mental issue" to Shouse, Shouse told him that although it may sound discriminatory, a driver's license was required for the position and that he would need to drive a vehicle owned by the university for training and

---

[4] UTEP also argues that Aranda did not suffer an ultimate employment decision because he "decided to simply not continue with his application." This argument, however, is circular, as the very basis of Aranda's claim is that UTEP disqualified him and terminated the application process because it perceived him as disabled; Aranda maintains "[t]his was not a choice, it was an adverse employment decision." In any case, because the record contains evidence that Aranda did not voluntarily end the application process, we find this to be an additional fact question that precludes dismissal of Aranda's claim.

certification. In response, Aranda complained of discrimination: "[a]t that moment, I told Mr. Shouse . . . that because having a driver's license wasn't required for that position, I was–I felt I was being discriminated." Aranda further explained:

> after he said that I–I would need to get a driver's license for me to go forward and continue, I explained to him that I never saw that on the job description. And I asked him, how is it relevant to this position if it doesn't involve any driving? And he mentions that because there was locations that I had to take state training or any other certifications for the police, I would be required to drive, use their vehicle.

According to Aranda, Shouse responded that "the school or police department has the right to make changes or requirement changes when they deem appropriate." When asked whether Shouse offered any other reasons as to why driving was required for the position, Aranda testified:

> He also implied that because it's a reliability issue, I will have to be able to drive a car . . . I explained to him that it seems unfair for me not to be able to get a—a chance to get the position because of my fear of driving. And he also said, well, yeah. We understand that it may sound unfair or discriminatory. But – but those are the rules that we have in place. And I—it doesn't say that on the [job description]. And then he says, you know what, because we [] can amend policies as we want or see fit. And I'm, like, well, can you provide me . . . the written rules and regulations of . . . your job policy?

Aranda maintained that Shouse then told him he could not continue with the application process. Aranda could not remember what exact language was used: "I don't remember the—the word, but he said I could not continue with the process. So it's just like if I was disqualified."

Shouse gave a contradicting account. He denied telling Aranda that a driver's license was required; but as for whether driving was required, Shouse admitted he "may have told him that it's a possibility" and that training might involve use of a "state vehicle." He also denied that Aranda told him that the job description said nothing about driving and testified "that was not discussed." When asked why he would have told Aranda about possibly using a state vehicle if he denied telling him that a driver's license was required, Shouse responded, "I don't recall how that came up. No, I do not." Shouse further testified that, after Aranda told him the job description said

13

nothing about driving, Aranda did not ask for a "policy" or "written document." Shouse also denied ever saying that UTEP or UTEP PD could change the job description at will, stating "I wouldn't say that." He likewise denied referring Aranda to HR, though he "vaguely recall[ed] something about him asking . . . for a legal department number because he felt he was being discriminated against." Shouse testified he gave Aranda the "main operator's number" and told him to ask for the legal department. When asked whether he told Aranda that even though it might sound discriminatory, he would still need a driver's license because of training obligations, Shouse answered, "I never used the word discriminatory once in the conversation." Later in his testimony, Shouse reiterated that he never told Aranda a driver's license was required but acknowledged that they discussed the possibility of driving a state vehicle for training. He denied saying that Aranda would be obligated to drive, but admitted telling Aranda "it was a possibility."

Aranda also relies on the ODOP email to show that the evidence creates a fact issue on whether UTEP disqualified him from the application process because it regarded him as impaired. He emphasizes the ODOP inspector's email, sent six months after the February 11 call, which informed UT campuses that a campus had disqualified an applicant for lacking a driver's license, admitted the UT System job description did not include that requirement, noted that campuses could impose one in certain circumstances, and clarified in the PCO index that the position did not require a driver's license. The email stated:

> Recently we had a campus come across the issue of a telecommunicator not having a driver's license. The campus advised the applicant that they did not meet the requirements to be hired and disqualified them from hire. The applicant made a complaint alleging they were discriminated against because they have a ADA and cannot drive.[5]
>
> After further investigation, the UT System job description for telecommunicator does NOT require a driver's license. However, your specific campus may require a driver's license if the telecommunicator will be driving a university owned vehicle

---

[5] UTEP does not refute that "a campus" refers to UTEP and that "an applicant" refers to Aranda.

or if they work overtime as a PSO and drive to the event. Each campus is different so you have to be aware of your specific job descriptions if different from UT System.

As such, we clarified on the index for telecommunicator that a DL is not required, however they must have a state issued identification card (US Passport could also replace state ID).

If you ever have a situation where someone does not have something and it is required, please call me or Inspector Lemmonds so that we can look into the matter. They may have an extenuating circumstance that exempts them.

The ODOP email records that UTEP "advised the applicant that they did not meet the requirements to be hired," "disqualified" Aranda for "not having a driver's license," and that Aranda "did not drive" due to an "ADA." This email supports the allegation that Aranda's lack of a driver's license—which Shouse knew was because of his mental impairment—was the basis for disqualifying him from further consideration. From this evidence, we agree that a reasonable factfinder could infer that UTEP acted on the perception that Aranda was impaired.

Aranda's "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). So long as the plaintiff meets his initial burden of establishing a prima facie case of discrimination, he is entitled to a presumption of discrimination. *See Mission Consol.*, 372 S.W.3d at 634. Viewing the evidence in the light most favorable to Aranda, we find the record creates a fact issue on whether UTEP prohibited him from continuing with the application process because it perceived him as impaired.

We conclude that Aranda has raised a genuine issue of material fact on his prima facie case—whether UTEP perceived him as impaired and disqualified him from hire based on that perceived impairment.

**B. UTEP produced evidence of a legitimate, nondiscriminatory business reason.**

Because Aranda has met his initial burden to show a prima facie case, we next determine whether UTEP produced evidence of a legitimate, nondiscriminatory business reason for disqualifying him from the hiring process. *See Alamo Heights*, 544 S.W.3d at 782.

UTEP maintains that the policy in place at the time required all applicants to submit a copy of their driver's license and that "Officer Shouse's testimony shows he discussed driver's licenses with Aranda because of his understanding or awareness of the policy requiring applicants to submit this documentation." Aranda responds that UTEP has not produced the policy that was in effect when he applied and that the record instead contains policies that were adopted after the fact.[6] However, we agree with UTEP that at this stage, the "question properly stated is not whether the policy existed, but whether Officer Shouse believed that a driver's license was required according to policy." "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).

The record contains inconsistent testimony and evidence regarding the requirements for the PCO position. In its combined plea and motion, UTEP argued that under policy 401B, applicants for the PCO position were required to submit a driver's license. UTEP also claimed that

---

[6] On appeal, Aranda challenges the admission of these two policies—UTEP's Exhibit A-2 and A-3—arguing they are irrelevant because they were not in effect when he applied. Although Aranda objected to these exhibits in his response to UTEP's combined plea and summary-judgment motion, the record does not contain a ruling on his objection. *See* Tex. R. App. P. 33.1 (requiring that after "the complaint was made to the trial court by a timely request, objection, or motion" the record must show that the trial court ruled "either expressly or implicitly"). Even if were to find that the trial court ruled implicitly, Aranda provides no supporting analysis, and the only authority he cites—Texas Rule of Evidence 403—addresses the exclusion of evidence for prejudice, confusion, or other reasons. *See* Tex. R. Evid. 403. Because Aranda has not provided adequate analysis or authority, he has waived this argument. *See* Tex. R. App. P. 38.1 (providing briefing requirements). In any case, we agree with UTEP that the two policies, though not in effect at the time, are relevant because each contain sections titled "Changes/Additions Since Last Publication" that are specific to the documentation required for PCO applicants.

this policy is reflected in form DP52TC—a required form for all applicants—which similarly included a driver's license as a required document. On appeal, UTEP relies on policy 401B to show that a driver's license was a required. But UTEP cites to the version of 401B that was revised in May 2022—after Aranda's application. UTEP also relies on form DP52TC, but the version it cites is dated "Dec 2021" and it is unclear whether it was in effect when Aranda applied. Aranda argues that even the outdated versions produced by UTEP conflict, because DP52TC requires a driver's license while 401B does not. Shouse himself confirmed that 401B and DP52TC conflict regarding whether a driver's license is required for PCO applicants.

Other inconsistencies appear in Shouse's testimony. When asked whether he believed a driver's license was required when Aranda applied, Shouse answered in the affirmative. But when asked whether the job description listed a driver's license, Aranda could not recall. He was also asked whether it was fair for Aranda to believe he did not need to submit a driver's license since it was not included in the forms he sent to Aranda and Shouse responded: "That would be fair." And when asked whether, at the time of the phone call, it was his understanding that Aranda would be disqualified for lacking a driver's license, Shouse answered: "No."

Although this evidence raises fact issues regarding whether the policy in effect at the relevant time required a driver's license and whether Shouse believed the requirement was in place, Shouse's stated belief nevertheless constitutes a legitimate, nondiscriminatory business reason. We therefore find UTEP produced evidence of a legitimate, nondiscriminatory business reason.[7]

---

[7] UTEP further maintains that "[b]ecause Aranda did not complete his application, UTEP has a legitimate, non-discriminatory reason for not hiring him." We reject this argument. Aranda claimed in his petition that UTEP discriminated against him "because it regarded him as a person with a disability, and refused to allow him to continue with the application process[.]" The record reflects that the application process for the PCO position consists of several phases. As UTEP's HR director explained, applications are first screened by HR to confirm minimum qualifications before they are forwarded to Shouse, UTEP PD's background investigator. Aranda's application passed this initial screening phase of the application process, and it was then forwarded to Shouse. The record reflects that Aranda was in the application process—Aranda submitted his application, evidenced by the "Application Summary," his resume, and his cover letter. In its EEOC position statement, UTEP itself maintained:

**C. Aranda's evidence raised a fact issue on whether UTEP's stated reason was pretext.**

Because UTEP met its burden of production, the burden shifts to Aranda to produce evidence showing that UTEP's stated reason was a pretext for discrimination. *See Quantum Chem. Corp.*, 47 S.W.3d at 477. UTEP maintains that Aranda has "not produced substantial evidence demonstrating that UTEP's legitimate, non-discriminatory reasons or its employment actions were both false and a pretext for illegal discriminatory animus." But Aranda was not required to produce substantial evidence; that is not the standard. Rather, "[a] plaintiff can avoid summary judgment if the evidence taken as a whole creates a fact issue as to whether the employer's stated reason was not what actually motivated the employer and creates a reasonable inference that discriminatory intent was a determinative factor in the adverse employment decision." *Madden v. El Paso Indep. Sch. Dist.*, 473 S.W.3d 355, 360 (Tex. App.—El Paso 2015, no pet.) (quoting *Bedgood v. Texas Educ. Agenc*y, No. 03-14-00030-CV, 2015 WL 739635, at *2 (Tex. App.—Austin Feb. 19, 2015, pet. denied) (mem. op.). And "although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom on the issue

---

Mr. Aranda submitted his employment application for the PCO position on January 1, 2022. In accordance with University procedure, his application was reviewed by UTEP's HR Office and forwarded to the UTEP Police Department for further consideration. Mr. Mark Shouse ('Mr. Shouse'), Police Officer, is the individual in the UTEP Police Department responsible for conducting background investigations and informing applicants of the *next step of the application process*, which is the completion of the DP1 Personal History Statement ('DP1'). Mr. Shouse sent Mr. Aranda an email on February 10, 2022, with instructions for completion of the DP1, and informed him of additional documents which needed to be submitted by Mr. Aranda at his scheduled 9:00 a.m. appointment on February 25, 2022 . . . Mr. *Aranda was not further considered for the PCO position* because he did not participate in the next phase of the application and selection process[.]" (Emphasis added).

As explained above, *supra* n. 4, the very basis of Aranda's claim is that UTEP prohibited him from continuing with the application process because it perceived him as disabled. We therefore cannot agree that "UTEP could not have hired Aranda simply because he did not complete his application," and reject that this constitutes a legitimate, nondiscriminatory business reason.

18

of whether the defendant's explanation is pretext.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal citation omitted).

Aranda maintains that UTEP's own policies and job descriptions do not require driving or a driver's license for the PCO position. When asked whether driving was listed as a duty for the PCO position, Shouse confirmed, "It is not listed as one of the duties." Shouse was also asked whether driving was an essential function of the PCO position, to which he responded, "It is not." Additionally, the PCO job postings by both UTEP and the UT System listed the position's required qualifications, duties, and essential functions; neither posting listed driving or a driver's license as a required qualification, duty, or essential function. Moreover, the version of policy 401B that UTEP relies on includes a section titled, "Disqualifiers," which does not list the lack of a driver's license.

Aranda also points to the email from the UT System ODOP. The ODOP email was sent to universities across the UT System and reported that a campus had disqualified an applicant who complained of being discriminated against over the lack of a driver's license, conceded that the UT System job description did not include such a requirement, acknowledged that campuses could impose the requirement in certain circumstances, and updated the PCO index to clarify that the position did not require a driver's license. The email specifically stated that a campus "advised the applicant that they did not meet the requirements to be hired and disqualified them from hire," but later confirmed that "[a]fter further investigation, the UT System job description for telecommunicator does NOT require a driver's license." A reasonable factfinder could view this evidence, particularly the clarification in the email that a driver's license was not required, as undermining UTEP's stated reason and supporting the reasonable inference that its reliance on a driver's license was pretextual.

UTEP also relies on the testimony of UTEP's HR director, who confirmed the same point in her testimony: neither the UT System job posting, UTEP's job posting, nor DP52TC list a driver's license as a requirement. The HR director further testified that if driving were an essential function of the PCO position, it would have been listed in the job description, and that neither driving nor a driver's license was required. When asked whether it would be a policy violation for Shouse to have changed the job description to impose a driver's license requirement, the HR director answered, "Yes," explaining that Shouse would first have needed to inform his superiors and HR before imposing such a requirement. Shouse himself answered in the affirmative when asked, "So you agree with me if driving and driver's license are not listed as a requirement on this job description . . . then it's not a requirement for the telecommunicator position; is that correct?" Walsh, UTEP's Chief of Police and the final decision-maker with authority to decide whether a driver's license is required, was asked whether Aranda's lack of a driver's license should have disqualified him for the hiring process; Walsh answered: "I don't know." This testimony supports a reasonable inference that UTEP's stated reason was pretextual, further raising a fact issue.

The hiring process likewise gives rise to a reasonable inference of pretext. The HR director testified that a recruiter first screens applications to confirm minimum qualifications before forwarding them to Shouse. In Aranda's case, the recruiter screened his application and determined he met the minimum qualifications for the position. Shouse also confirmed that HR first screened Aranda's application and then forwarded it to him. If possession of a driver's license were a requirement of the position, a factfinder could reasonably question how Aranda's application survived the initial screening, which further supports a reasonable inference of pretext.

Other evidence relevant to a showing of pretext includes UTEP's reaction to Aranda's claim of discrimination. According to Aranda's testimony, he told Shouse during the February 11

20

phone call that he felt he was being discriminated against because a driver's license was not required for the position. Shouse testified that after the call, he reported to UTEP PD Assistant Chief, Ray Rodriguez, that he had just "spoken with an applicant who asked for a telephone number for legal because he was being discriminated against." Shouse also informed another superior, Lieutenant Florencio Ramirez, about Aranda's complaint. But Shouse did not notify HR. Nor did Shouse contact Aranda again or clarify that he did not need a driver's license to continue. Aranda testified that he assumed HR would contact Aranda because "[t]ypically if an applicant . . . doesn't continue in the process, it's my understanding HR sends an email to them." However, Aranda testified he did not speak to Shouse or anyone at UTEP after the phone call, a fact confirmed by UTEP officials.

Despite UTEP's Equal Opportunity Office having both informal and formal processes for handling discrimination complaints, nothing in the record indicates UTEP initiated either process. Rather, Walsh testified that after Ramirez told him about the incident, he "acknowledged it, and that was it." Walsh did not report it to anyone or investigate, even though UTEP's policy requires reporting "when they know of or suspect possible discrimination." Walsh testified, "No. I didn't do any investigation or - or look into the matter to try to get information - investigate. I didn't do any investigation." As an Equal Opportunity employer, UTEP's own policy requires it to "take affirmative steps to ensure that applicants . . . are treated in a non-discriminatory manner regarding all aspects of employment." Walsh further testified that PCO's are not required to drive a university vehicle and that, as UTEP PD's Chief of Police, he did not recall ever telling anyone that a driver's license was required for the position.

We also consider Aranda's argument that evidence of an employer's shifting explanations can evidence pretext. UTEP's stated reasons for its actions varied over time. For example, UTEP

21

submitted log of internal notes from the EEOC that states: "According to R [Respondent UTEP], the interviewer [Shouse] was not aware that CP [Charging Party Aranda] had a disability, and the job did not require that he drives." However, in its formal position statement, UTEP neither confirmed nor denied whether a driver's license was required but alluded to the possibility through the language "other duties as assigned" in the job description. In its position statement, UTEP specifically stated: "the Position Announcement includes language for job duties which may fall under the category of 'Other duties as assigned'" and that this language "could reasonably and foreseeably result in the need for a license." UTEP also falsely claimed in its position statement that "[t]he call was brief, lasting one to two minutes," when the call was 4:23 long.

In its position statement, UTEP further claimed that "Mr. Shouse is not the individual who confirms driving requirements, and therefore did not convey such information to Mr. Aranda". UTEP also claimed in its position statement that "Mr. Shouse did not state anything about state training." However, Shouse himself confirmed in his deposition that he did in fact discuss training with Aranda and that he "may have" stated driving was required. Additionally, at his deposition on June 13, 2024, Shouse testified multiple times that a driver's license was not required and was not listed as one of the required documents in the February 10 email he sent to Aranda. However, in his affidavit signed five months later, Shouse claimed that a driver's license was required during the relevant time and that it was an oversight not to have requested one under ODOP 401B and DP52TC.

We find that these inconsistencies cast doubt on UTEP's stated reason and create issues of material fact on whether its reason is pretextual. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239–40 (5th Cir. 2015) ("A jury may view erroneous statements in [an] EEOC position statement as circumstantial evidence of discrimination. We have also found an employer's

rationale suspect where it had not remained the same between the time of the EEOC's investigation and the ultimate litigation.") (cleaned up); *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000) (reversing summary judgment entered for employer partially because the employer's report to the EEOC "contained false statements"). As the Supreme Court has stated, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. Shifting defenses and untruthful accounts are relevant to the analysis and can support a finding of pretext because "[i]f the trier of fact does not believe the employer to have given a truthful account of its decision, it is reasonable to infer that the most likely explanation is the one the employer cannot admit–that it acted for retaliatory or discriminatory reasons." *Ameristar Airways, Inc. v. Admin. Review Board.*, 650 F.3d 562, 569–70 (5th Cir. 2011). A factfinder could reasonably infer pretext on this record, reinforcing that resolution of the fact issues in this case lies with the factfinder. It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Based on the above evidence, a reasonable jury could conclude that UTEP's stated reason was a pretext for discrimination based on Aranda's perceived disability. *See Miranda*, 133 S.W.3d at 228. The record also supports a reasonable inference that discriminatory intent was a determinative factor. *See Madden*, 473 S.W.3d at 360. Taking as true all evidence favorable to Aranda and indulging every reasonable inference in his favor, we conclude that the trial court did

not err by denying UTEP's combined plea to the jurisdiction and summary-judgment motion. Accordingly, UTEP's sole issue is overruled.

## IV. Conclusion

For these reasons, we affirm the trial court's denial of the combined plea to the jurisdiction and summary-judgment motion.

MARIA SALAS MENDOZA, Chief Justice

November 12, 2025

Before Salas Mendoza, C.J., Palafox, J., and Longoria, J. (Ret.)
Longoria, J. (Ret.) (sitting by assignment)
Palafox, J., dissents without opinion.